Good morning, your honors. May it please the court, my name is Mary Kenny, and I'm here on behalf of AMICUS, the American Immigration Council. A petitioner has generously offered to share her time with me, and so I'll be using seven minutes of the 15 minutes that are allocated. I'm here to address the issue of the court's jurisdiction over the BIA's denial of the motion to exercise its sua sponte authority to reopen the proceeding. And this court in Ekamian v. INS back in 2002 found that it had no jurisdiction to review a sua sponte motion to reopen. It based its decision on the fact that the regulation at issue that gave the BIA the authority to reopen sua sponte contained no standards. So it looked to Heckler v. Cheney and to the APA 701A2, which provides that there is no review where an agency's decision is committed to agency discretion. It looked to those and it said this isn't something that's committed to agency discretion, no review, no jurisdiction. Kukana didn't specifically overrule Ekamian, but do you think that if we were confronted with Ekamian today, we would have, under Kukana, we would have authority to reverse the? I think you have authority to, I would submit at any rate that you're bound by Kukana, that in fact you're correct, it did not overrule it. Kukana says in a footnote that it's taking no position on the Ekamian and the other cases from the other jurisdictions around the country that find no jurisdiction. However, under this Court's decision in Miller v. GAMI, where there's an intervening Supreme Court case in which the reasoning of the Supreme Court decision is irreconcilable with the reasoning of the earlier panel precedent decision from the Ninth Circuit, the Ninth Circuit is bound by the Supreme Court case and can consider the Supreme Court case, the prior Ninth Circuit case to have been overruled. We construe that very narrowly. Well, I think here, if I could make my argument, Your Honor, with all due respect, I do believe that there is an irreconcilable difference here and that it does fit into a narrow construction, that Kukana left the door open. It didn't say one way or the other. Exactly. And that's why I'm not convinced that we're compelled to say that our prior cases are. But, Miller, can I please? I'm sorry. Excuse me. No, go ahead. Miller doesn't say that the holding needs to be identical or that the issue actually needs to be identical. It says the reasoning needs to be in conflict. And that's what I think is in conflict here. The reasoning of Kukana is that an agency cannot be permitted to insulate its own decisions from judicial review by regulation, where there is no congressional directive limiting judicial review, where there's either no delegation of authority to the agency to make that determination or no implicit or explicit congressional limit on judicial review. But as you've indicated, Kukana doesn't speak specifically, and other circuits have declined to extend Kukana to a BIA denial to reopen Sua Sponte. Other circuits have declined to do that, Your Honor. But the Sixth Circuit has the ---- Here we go again. Figure for me. The court in the Sixth Circuit did encourage the court to take the issue en banc. It has not yet done so. It may do so in the future. Certainly there was a strong decision by the majority and a concurrence, both of which believed that it was time to overturn the Sixth Circuit decision that is the same as Ekamian. And the issue is under review in the First Circuit at this point in time. And in the case that the government has cited in its 28-J letter to you, it's on a petition for rehearing at this point. And the ---- And there have been some inroads into courts finding jurisdiction in limited circumstances anyway with respect to Sua Sponte jurisdiction. So, for instance, the Second Circuit in a case called Mahmood, the holder, I believe, and I can get you that cite. I have not cited it for you, but I will get it to you, found that where there's an error of law that the BIA decision is premised on, it has the authority to remand to see whether or not the BIA would have issued a different decision had that error been corrected. And so it's somewhat of an opening of the door. So we believe and contend that this Court either has authority to itself find that it's bound by Kukana and find that, in essence, Kukana did overrule whether or not the Supreme Court made that determination, because the reasoning is irreconcilable. And, in fact, in the Zatino case, which this Court issued, I believe, at the end of August, this Court did find that it was bound by Kukana. And in Zatino, the case was really parallel to the Ekiminian decision. In Zatino, the question was the BIA's discretion to grant a motion to allow a late-filed brief. And like the motion to reopen Suspante, there was... Counsel, your time is up. Okay. It is a case that I cite in my brief. Thank you. Good morning, Your Honors. If it pleases the Court, I am Claire C. Fuentes, attorney for Petitioner. Separate and apart from the Suspante issue, we believe that the BIA erred in three significant respects. One, the BIA erred in finding that the Petitioner failed to meet the requirements for sending his in absentia deportation order set forth in matter of Grijalva and in this Court's decision in Arrieta v. INS. Two, we believe that the BIA also erred in failing to address Petitioner's argument that entry of the in absentia deportation order was improper because the government failed to show that in-person service of Petitioner's last hearing notice when he appeared for his penultimate hearing was impracticable as required to effectuate proper service. Third, the BIA also erred in holding that the case law allowing rescission based on lack of receipts of a hearing notice is inapplicable to deportation proceedings. In this case, Petitioner met the evidentiary requirements for Arrieta by rebutting the presumption of service by certified mail. Matter of Grijalva held the presumption of effective service may be overcome by the affirmative defense of non-delivery and in order to support this affirmative defense, the Petitioner must present substantial and probative evidence such as third party affidavits or other similar evidence demonstrating that there was improper delivery or that non-delivery was not due to the Petitioner's failure to provide an address where he could receive mail. Thank you. Thank you. Counsel, may I ask you, are you addressing the motion to reopen at all? The motion to reopen that was sought to talk about the fact. You mean the, let me see if I understand. Well, what I was addressing. On the CARA application. I didn't want to talk about that at all. You mean as far as. Whether or not it was equitably told. I can address that if you'd like. To me, I don't know about my co-panelists, but to me that's your strongest argument. Okay. So could you discuss that issue, please? Sure. So if I remember the record correctly, the Petitioner's wife was given relief under NACARA. Yes. And he was seeking relief under NACARA, but missed the deadline. Well, as far as equitable tolling, due diligence. He missed the deadline, right? And then he filed a motion to reopen. Well, he did miss a deadline, yes, Your Honor, but we find that it was equitably told. And that due diligence is required only after an alien definitely learns of the fraud. The government's argument. When did he learn of the fraud? When did he learn that Ramos was not a lawyer? Well, he learned of that on January 7, 2005, when the wife was granted NACARA. And they questioned Byron as to, Byron's secretary, as to why he didn't go with her to the interview. And then that's when she admitted that he was not an attorney. So that date was January 2005? Yes, January 2005. So up to that point, he was under the impression, because of Byron's misrepresentations, that his motion was pending because the wife had to be granted first. And so he thought all this time that, you know, that's the requirement, you know, the principal beneficiary needs to be granted before me. But then he started doubting, you know, Byron's statements when he realized that he wasn't even an attorney. And that's when he consulted with his current counsel, who ordered a FOIA, Freedom of Information Act, in order to find out if it was true that Byron had, in fact, refiled a motion, because originally the motion that Byron filed was rejected by the court. Was there anything that Ramos did or didn't do that should have alerted them that he wasn't a lawyer after all those years? Was there anything that just smelled funny or didn't seem right? Well, it didn't appear to them that there was anything funny, since it seemed, you know, it makes sense that in order for a derivative to be granted, a principal applicant would have to be granted first. I mean, yes, I mean, the filing was rejected, but Byron came up with a good explanation saying that, you know, the wife had to be granted first. And, you know, I mean, I had cases in NCAR that would take three years or even longer in order to be granted. So it wasn't unusual, you know, to hear in the community that the cases were pending for many, many years. Thank you. So in ‑‑ I think that one of the other arguments that is strong and is a good basis on which to find is that they really should have and had the opportunity to give him in‑person service. At that penultimate hearing, he was present. The court clerk was present. The court clerk was, in fact, the person who sent by certified mail the notice the next day, and he should have been given the notice. Are they required to do that? Is the government required to do that? Well, it does say in the regulations that if the person is there, that they should be doing that. Ninth Circuit has held that that is a rule in Hamazosbian v. Holden, Ninth Circuit 2009. Did they have the date at that point? Was the date set? Well, the one who sets those dates is the court clerk, and she was present. She's the one who told him, we'll send you, you know, information by mail. And, you know, just want to point out that he, when he said that, you're going to be sent by mail, he said, well, then I've got to report a change of address, fill out a change of address form, which change of address form also asked for his phone number. And, you know, I think it's really explained well in Peralta Cabrera, Seventh Circuit 2007. I'm going to read you just a small quote from there. It says, it's difficult to take seriously the government's contention that Peralta Cabrera forwarded service of his hearing notice when it could have at any time served the notice on him in person but failed to do so, just like in this case, because the government opted instead to serve Peralta Cabrera with his hearing notice via certified mail. It had the responsibility to ensure that the notice would be delivered to the address provided. But it was delivered to the address provided in this case because the government noted that there were two efforts to have it signed for, and it wasn't. So it's kind of a different factual scenario. Well, that's true. I mean, there was they served it, but he did not receive it. And I think that's where the key element comes in, because in order to effectuate proper service, he had to have received it. Not the certified mail. For regular mail, that's true, but not the certified mail. Well, I think that because the language of INA 240 little B5C2, which is providing for the rescission of an in absentia removal order, is identical to the language of former INA 242 big B C3B providing for the rescission of an in absentia order, it reads, upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice, other circuits have held that removal and deportation standards are the same. There's First Circuit, Kozak v. Gonzalez, 2007. The Seventh Circuit permits rescission of in absentia deportation orders the same as for in absentia removal orders for non-receipt. That would be Peralta Cabrera v. Gonzalez. And in this case, the petitioner established actual non-delivery by the Postal Service. You've exceeded your time. We'll give you a minute for rebuttal, but I did want to ask you, did you attempt to resolve this case with the government? Did you all sit down and try to resolve this case through mediation? Yes, that effort was made and it was rejected by the government. Thank you. We'll hear from the government. May it please the Court. I'm Glenn Jaeger. I represent the Attorney General in this matter. There are a number of issues in this case. I guess I should start with Ekeneman. Ekeneman is still good law. Four circuits have upheld their precedent decisions, which held that they have no jurisdiction to review suit-responding determinations by the board. So the government has not changed its position in light of Kukena with respect to reviewability of reopening BIA decisions? No, Kukena is not irreconcilable with Ekeneman. In the fact that Kukena dealt with the discretionary review, borrowed a 1252A2B, in that case they said you cannot, Congress cannot, only Congress can remove a jurisdiction if it gives a right to a motion to reopen. Congress gave petitioners a right to move to reopen statutory right, and they said, Kukena said, that only Congress in that case can take that right away, not the agency through regulation. Why doesn't that apply here? In this case, Congress didn't give a right to petitioners to invoke the board's suit-responding authority to reopen a case on their own motion. And that's basically the distinction between Kukena and Ekeneman. And as far as Zatino, this Court did rely in some form on Kukena, but in a footnote it just specified we find the argument unpersuasive in light of Kukena, but it didn't specify why or how. No reasoning. There's no reasoning to take from that case as far as to put forward in this case. So therefore, I just state that the Court still lapsed jurisdiction. Ekeneman is still good law, and Kukena did not change that. In fact, as previously stated, they specifically said, gave no opinion as to suit-responding determinations in Kukena. So in that sense, another issue is the equitable tolling. You would concede it's unclear at best? Pardon? You would concede it's unclear at best as far as the applicability to a case like this of Kukena? I don't think it's unclear. There's no way to know how it applies? Kukena applies to Ekeman? Yes, to this fact situation. I don't think so, because Ekeman, I mean, Kukena dealt with 1252A2B and a statutory right to motion to reopen. Ekeman deals with suit-respond to reopening, which is not a statutory right, and it was never brought into the Code as motions to reopen were in IREA in 1996. Congress specifically brought in the right to motions to reopen in IREA in 1996 where they left suit-responding determinations in regulations at 103.2. If there are no more questions, I'd like to move on to equitable tolling as far as the NACARA motion. In this case, I would concede equitable tolling applies. Equitable tolling, yes, it does apply generally, and it does apply here if they establish it diligently. But in this case, I've never understood what exactly the problem was that triggered the date when they were supposed to realize there was a problem. Do you take issue with opposing counsel's representation that the first time the petitioners were aware that their representative was not an attorney was January 2005? No, they should have been aware, and they were aware of problems when the motion was apparently rejected. There's not really no evidence in the record of why it was rejected. So your argument is they should have been aware when the petition was rejected? Yes. And why is that true? Because the petitioner was aware at that time there were problems, and also there was a fact that apparently he should have known he was not an attorney because he never regained work authorization. I mean, his work authorization was denied like a year or six months before the motion was filed, and there's no evidence that he ever asked his notario to get his work authorization back. And in that sense, he... I don't understand why that would make him think he was an attorney, maybe a bad attorney. Well, it seems to me he would want his work authorization back, and he would ask the person he probably thought was an attorney to get his work authorization back because there's no evidence in the record that that was ever done.  The fact that he didn't ask, how does that lead one to conclude that he should have known? It seems like that was a pretty important part of his life that he would want employment back, and he would have dealt with that with the person he thought was an attorney, who apparently wasn't. So in that sense, he should have known. Apparently it took a lot of time to get things done, both he and his wife's applications and things. So time in and of itself, are you saying that alone should have been a trigger for him to be unnoticed? I think he should have been unnoticed from almost day one as far as when he apparently didn't get his work authorization and there was problems with the motion to reopen. But there are attorneys who do that, and they say, you know, it's in a black hole somewhere. Don't worry, I'll get everything done. So why would that put one on notice that this person is not an attorney? I don't understand the logic. As far as the problem with the motion? As far as the problem with the motion to reopen? Problems, period. Why would that put someone on notice that the person is not an attorney because there are problems? I think it's just, as you say, things happen to even attorneys. But in this case, I think it would put him on notice to inquire as to the status of this person. I mean, there's no record of any correspondence with this attorney. There's no record of payment. There's nothing in the record as far as any relationship with this notario. So as far as why he didn't inquire or should he be put on notice? I believe he should have been when that motion was rejected. And what I was going back to initially is the initial problem is what exactly was the problem with the notario? He was not eligible. He was not married to be in NACARA. He had to be derivative. He was not eligible on his own right to NACARA benefits. He had to go derivative. And in that sense, he had to be married to a spouse that was eligible for NACARA. The deadline for filing a motion to reopen for NACARA was September 1998. In that motion under the regulations at 103.43, there were specific requirements of what has to be put in the motion to reopen. One is eligibility. He has to establish he's within a class of eligible NACARA beneficiaries. And he was relying on his lawyer to take those steps to make that happen? But he was not. He was relying on a lawyer, as it turned out. Yes, but again, I'm asking the court what exactly was the problem. He could not file a motion. His motion to reopen was not based on NACARA. It was based on rescinding his deportation order only. He never mentioned NACARA in the motion to reopen. And why is that? Because he couldn't. He was not married at the time. He was not a derivative. He was not a spouse of a person eligible to reopen. So in that sense, what exactly was he supposed to file at that time? A NACARA motion that he wasn't eligible for. So, again, that brings it back to the point. When he filed his motion to reopen, he was not married? He was not married until November 98. And the deadline for filing a motion to reopen from NACARA was September 98. September 98. So he would have never been eligible for NACARA? Apparently. No, not according to the regulations. I mean, you could file. The regulations gave him another approximately a year, November 98, to file an application. If you had to file a motion to reopen by September 98, you could file the application the following year. And then if he was married at that time, he would be eligible for NACARA, really? No. The motion to reopen itself, if you look at, I want to stress, 103.43, I believe it's E. In the motion to reopen, he had to establish eligibility as far as being within one of the six classes of eligible people. At the time the motion was filed? Right. And the application was totally separate. The regulations state the application could be filed later. The motion to reopen had to be filed by September 98. So, again, what was in NACARA? Unless it was told, right? How can you – I don't know how you can tell not being married. But I'm just saying, unless it was told, right? And, again, I don't know what you can tell, the deadline until he was married? I mean – so, again, I don't know what the – He was – did the I.J. reopen because the I.J. thought it was told by the notario milking this case for all this time without doing anything? No, the I.J. found that it was not told. He did not act diligently. Why did the I.J. reopen? The I.J. reopened because of Swiss bond. He thought the equities of the case were enough to – Chief Justice Warren used to ask sometimes, is it fair? Was it fair to reopen in this case? And the I.J. thought it was. The I.J. thought it was based on the Swiss bond that he presented, quote, exceptional situation based on equities. It seems like a kind of a mindless bureaucratic effort here to undo the I.J.'s action just because the – he was late on his – filing his motion. Well, I guess that goes to the court's jurisdiction as far as – as far as the board did a Swiss bonding determination saying that the I.J. There was no exceptional – there was no – not an exceptional situation here. So in that sense, the court really has no jurisdiction to look at why the I.J. did not – or why it reopened the case in that sense. We probably don't or might not have jurisdiction to examine why the I.J. did what he did, but it looked like he got it right. Well, in the – I mean, I don't know. We don't have jurisdiction to determine whether or not the equitable tolling should apply to the motion to reopen. I believe you – I believe you do have, except to the point that Petitioner throughout the whole proceedings below stated that that was part and parcel of the I.J.'s determination as far as his consideration of the Swiss bond reopen. That's a legal question, so that's a question that we can answer. In the form of Swiss bond reopening, I don't believe – No, no, no. We can answer the question whether or not the motion to reopen should have been equitably tolled, the time for filing it. I believe – if – I would concede if that doesn't fall within the Swiss bond – the I.J. by the BIA. Do we have jurisdiction to determine that? There is a – I cited my brief. You're struggling with this one. You don't want to give it up. I cited a jurisdictional provision under the in absentia removal order that the court, when reviewing in absentia – I can't say that word today. In absentia. In absentia removal order, they can only look at three things. Only one is applicable here as far as the validity of the notice he was given. And the court – I don't believe the court has ever ruled that they can look at subsidiary discretionary relief when reviewing a motion to reopen to rescind a deportation order. And I don't have that – I think it's 12 – the old pre-IRA statute is 1252B, I believe. And the court has not stated a position on that as far as my research is concerned. I don't understand your argument. I thought that we had – that it's a legal issue as to whether or not a motion to reopen was timely. It is a legal issue, but only in the – I'm bringing the context of rescinding an in absentia removal order where the court's jurisdiction is limited. That may be the relief that's sought. Right. That's something that the BIA can decide or not decide. But in terms of the motion to reopen, we can look at the issue and determine whether or not the determination that it was untimely was legally correct. That is a legal question, yes. That's a legal question. So what the BIA does with it if we decide that the BIA erred in determining that it was untimely, what the BIA does with it if we decide that is neither here nor there for our purposes. I would state the court does have jurisdiction of that legal question, but for if, as you say, it is not part of the BIA's suits body determination, and if it doesn't fall within the jurisdictional bar as far as reviewing only the three questions dealing with an in absentia removal order. Yeah. The motion to reopen is separate. Yes. I will concede the second. Like I said, the Ninth Circuit, I believe, this court has not ruled on the fact on this specific question as far as what the jurisdiction is when reviewing and rescind. But we have tons of cases talking about reviewing motions to reopen. Yeah. I believe not in the context of a motion to reopen to rescind an in absentia removal order where jurisdiction is limited to three questions. So I will concede the Second Circuit has ruled that when you file a motion to reopen to rescind an in absentia removal order along with a motion to seek discretionary relief, they have deemed it two separate motions. In that case, they have found your... I think we, I mean, I'm pretty sure that we treat motions to reopen as separate from the relief that's being solved. I could be wrong. I did some research on it. I found some, like, 10-year-old cases unpublished that said the court has no jurisdiction over asylum when reviewing an in absentia removal order. So, yeah. That's a good point. But anyway, my main point is as far as this tolling thing, I don't know what Notorio was supposed to file at that time in 1998. He was not a derivative. He was not a spouse. So how could he file a NACARA motion to start the whole clock? I mean, there was never, he was never eligible for NACARA. Instead of that, can you talk to me before your time is almost up? Why doesn't this case meet the exceptional circumstances standard? You talked about exceptional circumstances. Isn't there enough of a record here to satisfy that? Well, first of all, I would posit that the court has no jurisdiction to look at whether assuming, assuming they do, why there's no exceptional situation here. I believe that's on a case-by-case basis. It's really, I mean, again, he's never eligible. In this case, yes or no? What? Yes or no. In this case, on these facts, yes or no exceptional circumstances? No. Because? He's not eligible for NACARA. By the motion, he was never eligible. Okay. Thank you. All right. Thank you. Thank you. Rebuttal. Counsel, could we ask you whether or not you agree with the government that your client was not eligible for NACARA relief when he filed his motion to reopen? I do not agree with that. The government argues that equitable tolling of the deadline doesn't apply because when he filed the motion, he had yet to marry his NACARA 203 principal wife. However, the final rule implementing NACARA 203C special motions to reopen recognized that almost no NACARA 203 dependent would qualify for NACARA 203 relief by the September 11, 1998 deadline for filing an initial NACARA 203 motion to reopen because a principal NACARA 203 beneficiary must first be granted relief before his or her dependent becomes a NACARA 203 beneficiary under the statute. What are you reading from? I am reading from our reply brief. What's your source? What are you taking that from? What I'm taking that from is the Federal Register, Volume 64, Number 54, 13663, 13667, March 22, 1999. Also, Section 309C5. Can you take a breath, please? Sure. It's because I know that I'm already out of time. It has so many things I'd like to say. It might be helpful if you gave us the site again. For the Federal Register, 64FR, what was it? Okay. So that's the Federal Register, Volume 64, Number 54, 13663 through 13667, dated March 22, 1999. Now, IRA-IRA, as added by Section 203A1 of NACARA, as to Section 309C5C13, realizing this, the final rule permitted filing a skeletal initial NACARA 203C motion to reopen based on prospective eligibility as a NACARA 203 dependent and provided a separate November 18, 1999, deadline for establishing that the principal NACARA 203 beneficiary had applied for relief. And by that time, he was married. All right. All right. Thank you, counsel. We understand your argument. Thank you. Okay. Thank you to both counsel. We'll be in recess for five minutes.
judges: Zouhary, Goodwin, Rawlinson